[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION 
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff, whose maiden name is Christine Dufficy, and the defendant were married in Croton Falls, New York on January 18, 1992. The defendant has resided continuously in the State of Connecticut for at least twelve months immediately prior to the date of the filing of the complaint. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There is one minor child issue of the marriage, Alexandra Salame, born July 24, 1993. No other minor children have been born to the plaintiff wife since the date of marriage of the parties. Neither the plaintiff nor the defendant is receiving assistance from the State of Connecticut. The court finds the following additional facts.
The parties are in dispute as to the cause of the breakdown of the marriage. From the evidence presented, the court finds that each party is equally at fault for the breakdown of the marriage.
The parties are in dispute as to the validity of a prenuptial agreement entered into between the parties on December 27 and December 28, 1991. The plaintiff claims that the prenuptial agreement is unenforceable and the defendant seeks to enforce it. Under the terms of the prenuptial agreement, the defendant retains his interest in the following assets that he owned: "(a) any interest in the Salame Trust, whether distributed or undistributed, including but not limited to the corpus of said trust, income therefrom, or any appreciation in value of same; (b) any interest in Dandy Distributors Inc., including but not limited to any increase in percentage interest, income therefrom, or any appreciation in value of same; (c) any interest in subsequently inherited or gifted assets, regardless of the source, including but not limited to income from said assets or any appreciation in value of same." The leading case regarding prenuptial agreements is McHugh v. McHugh 181 Conn. 482 (1980). In discussing the enforceability of prenuptial agreements, theMcHugh court stated in part at pages 485-486 as follows: CT Page 3139
 Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice. . . .
 An antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law . . . . To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing. . . . A party must, of course, be aware of any right that he possesses prior to a proper waiver of it. [Citations omitted.]
1. THE ISSUE OF WHETHER THE CONTRACT WAS VALIDLY ENTERED INTO.
In discussing the first criteria, the McHugh court at pages 486-488 stated in part as follows:
 To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing. . . .`A party must, of course, be aware of any right that he possesses prior to a proper waiver of it. . . .' The duty of each party to disclose the amount, character, and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights. . . . `The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can CT Page 3140 ensure intelligent waiver of the statutory rights involved.' [Citations omitted.]
 The court's first inquiry, then, is to ascertain whether the agreement complies with the ordinary principles of contract law and whether its terms and the circumstances surrounding its execution are such as to demonstrate that the parties were aware of their legal rights and their respective assets and liabilities, and proceeded by the agreement to alter those rights in a fair and voluntary manner. [Citations omitted.]
 The plaintiff makes the following argument regarding this first criteria:
 It is the Plaintiff's position that she did not enter into the agreement voluntarily. She was under pressure to sign. The whole subject of a prenuptial agreement was presented to her approximately one month before the second scheduled wedding date. There had never been any discussion of a prenuptial agreement prior to the first scheduled date. The Defendant told her that his father would fire him from his employment at Dandy Distributors and his father would disinherit him if she did not sign. She testified she felt there would be no marriage if she did not sign. The Defendant also testified that he offered to postpone the wedding again. Therefore, the Plaintiff felt if she wanted this marriage to take place, she had no alternative but to sign this agreement.
The court is not persuaded by that argument. The court makes the following findings of fact.
The parties met in the spring of 1989 and became engaged in December of 1989. They commenced living together in the Spring of 1990 in the defendant's father's condominium. The first wedding date was set for June 15, 1991. In the middle of May, 1991, the defendant requested a postponement of that wedding date because of recent deaths in his family. The defendant was particularly distraught over the loss of his grandfather. The plaintiff did not agree to the postponement of the wedding and the engagement was broken in July, 1991. The plaintiff then resumed living with CT Page 3141 her parents in July, 1991. In October, 1991, the parties again became engaged and commenced living together, planning for the wedding date of January 18, 1992. In early December, 1991, the plaintiff again moved back with her parents in planning for the wedding date. The defendant first discussed the subject of a prenuptial agreement with the plaintiff in October, 1991. He informed her that the reason for the prenuptial agreement was to insulate the family businesses of the Salame Family Trust and Dandy Distributors, Inc. in the event of death or divorce. The prenuptial agreement, as originally drafted, also provided for an alimony schedule in the event of dissolution of marriage. Alimony had not been previously discussed with the plaintiff but had been included by the defendant's attorney. The plaintiff did not agree to the alimony clause and it was removed after negotiations. The plaintiff discussed the prenuptial agreement with her father. She also discussed the agreement with a New York attorney, who was recommended to her by her father. She then retained Attorney Alfred Belinkie to represent her regarding the prenuptial agreement. Attorney Belinkie is a past president of the American Academy of Matrimonial Lawyers. He fully explained the premarital contract to the plaintiff and its legal significance. The court finds that the defendant did not tell the plaintiff that in the event she did not sign the prenuptial agreement, his father would terminate his employment and disinherit him and they would be poor. The court further finds that there was no valid basis for the plaintiff to believe that there would be no marriage if she did not sign the prenuptial agreement. The court further finds that the prenuptial agreement was not signed by the plaintiff under duress and that she signed it voluntarily.
At the time the premarital agreement was entered into, the defendant disclosed assets that he claimed had a total value of five hundred ninety-five thousand six hundred twenty-nine ($595,629) dollars. In fact, the total value of the assets owned by him at the time of the premarital agreement amounted to two hundred ninety-six thousand eight hundred seventy-nine ($296,879) dollars. The differences between the two values is as a result of the interest of the defendant in Dandy Distributors, Inc. amounting to one hundred thousand ($100,000) dollars rather than three hundred thousand ($300,000) dollars at the time of the premarital agreement, and his interest in the Salame Trust amounting to thirty-one thousand two hundred fifty ($31,250) dollars, rather than one hundred thirty thousand ($130,000) dollars, at the time of the premarital agreement. The court requested all parties, when post-trial briefs were ordered, to CT Page 3142 provide to the court any decisions, either in Connecticut or elsewhere, as to the effect on a premarital agreement of overvaluing assets as opposed to undervaluing assets. No decisions have been provided by either counsel and this court has been unable to find any. The plaintiff makes the following claim regarding this issue:
 It would appear that the Defendant overstated his assets by approximately $300,000.00 in the Dec. 1991 prenuptial agreement. Assuming the Court finds that his disclosure was not accurate, which he has admitted, it is the Plaintiff's position that that, in and of itself, makes the agreement unenforceable.
 A question was raised concerning the over-valuation of assets necessarily working an injustice on the Plaintiff? She had a right to rely on the Defendant's representations and those representations were to be the basis of an intelligent waiver. Therefore, when that representation is wrong to a substantial extent, the agreement should be unenforceable. If nothing else, the Plaintiff thought she was entering into a marriage with a Defendant who was economically secure, who would be able to provide for herself, himself and their children. Perhaps she was relying on a security concept which was erroneous. Furthermore, if the assets had been properly evaluated, would it have not raised some questions with regard to the necessity of signing a waiver of minimal assets?
The court is not persuaded by that argument.
There is no credible evidence in this case that the plaintiff was willing to waive any claim that she had in the defendant's interest in Dandy Distributors, Inc. if that interest was worth three hundred thousand ($300,000) dollars, but was not willing to waive any claim she had in his interest in Dandy Distributors, Inc. if that interest was only worth one hundred thousand ($100,000) dollars. Similarly, there is no credible evidence in this case that the plaintiff was willing to waive any claim that she had in the defendant's interest in the Salame Trust, if that interest was worth one hundred thirty thousand ($130,000) dollars, but was not willing to waive any claim that she had in his interest in the Salame Family Trust if the interest was worth only thirty-one thousand two hundred fifty CT Page 3143 ($31,250) dollars. The court finds that there has been a valid waiver by the plaintiff of property rights in Dandy Distributors, Inc. and the Salame Family Trust.
2. THE ISSUE OF WHETHER THE TERMS OF THE PRENUPTIAL AGREEMENT VIOLATE STATUTE OR PUBLIC POLICY.
In discussing this condition, the McHugh court at pages 488-489 stated in part as follows:
 It is clear that antenuptial agreements will not be enforced where to do so would violate the state statutes or public policy. In this regard, it is necessary to distinguish between the violation of statute and the informed and voluntary waiver of rights created by statute. The former is prohibited while the latter is typically the object of such agreements. A spouse's waiver of the right to claim entitlement to certain property upon dissolution of marriage, for example, could, under appropriate circumstances, be valid, while a spouse's contractual agreement not to be liable upon dissolution of marriage for the support of children he has a duty to support would not be. Similarly, antenuptial agreements that promote, facilitate or provide an incentive for separation or divorce are generally opposed to public policy and of dubious enforceability. Thus, a provision of an antenuptial agreement waiving the right to defend against a future divorce action, or one creating a substantial economic advantage upon dissolution irrespective of fault, or one relieving one spouse of the duty to support the other during the marriage, has been said to contravene public policy. [Citations omitted].
The court finds, in this case, there has been an informed and voluntary waiver of rights created by statute by the plaintiff. The court finds that this agreement does not violate any state statute or public policy.
3. THE ISSUE OF WHETHER THE CIRCUMSTANCES OF THE PARTIES AT THE TIME THE MARRIAGE IS DISSOLVED ARE NOT SO BEYOND THE CONTEMPLATION OF THE PARTIES AT THE TIME THE CONTRACT WAS ENTERED INTO AS TO CAUSE ITS ENFORCEMENT TO WORK INJUSTICE. CT Page 3144
In discussing this condition, the McHugh court at page 489 stated in part as follows:
 Finally, an antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice. Thus, where a marriage is dissolved not because it has broken down irretrievably, but because of the fault of one of the parties, an antenuptial waiver of rights executed by the innocent party may not be enforceable, depending upon the circumstances of the particular case and the language of the agreement. Likewise, where the economic status of parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice. Absent such unusual circumstances, however, antenuptial agreements freely and fairly entered into will be honored and enforced by the courts as written.
The circumstances of the plaintiff at the time of the premarital agreement were as follows: bank accounts; Fleet Bank savings — eight ($8) dollars and Fleet Bank checking — four hundred ($400) dollars.
The above bank accounts were disclosed in the prenuptial agreement entered into between the parties. In addition, the plaintiff had liabilities at the time of the premarital agreement consisting of a college student loan with a balance of seven thousand four hundred eighty-seven dollars and sixty-one cents ($7,487.61) that was not disclosed by her in the premarital agreement. The current financial circumstances of the plaintiff are as follows: (a) motor vehicle — 1993 Ford Escort equity two thousand ($2000) dollars; (b) jewelry — diamond ring, fair market value twenty-one thousand ($21,000) dollars; pearls, fair market value one thousand four hundred ninety-five ($1495) dollars; necklace, fair market value two hundred fifty ($250) dollars; diamond earrings, fair market value two hundred fifty ($250) dollars; (c) Putnam County Savings and Checking account two hundred nineteen ($219) dollars; (d) IRA Fahnestock three thousand twenty-two dollars and ninety-one cents ($3022.91 ); and (e) IRA Hudson Capital Fund one thousand eight hundred ninety-six ($1896) dollars. CT Page 3145
The total value of all assets is thirty thousand one hundred thirty-two dollars and ninety-one cents ($30,132.91). Her total liabilities amount to forty-four thousand eight hundred seventy-eight dollars and seventy cents ($44,878.70). The financial circumstances of the defendant at the time of the prenuptial agreement were claimed to be the following:
1. Fleet Bank Savings Account $8,500.00
2. 12 shares Citicorp @ $10.75/share 129.00
3. Cortland Trust/Us Bioscience 67,000.00
4. Dandy Distributors, Inc. — 10% interest 300,000.00
5. Note Receivable (Albert J. Salame, Sr.) 75,000.00
6. Salame Trust — 25% interest 130,000.00
7. Miscellaneous personal property 15,000.00
TOTAL ASSETS $595,629.00
The assets disclosed were overvalued and the following reflects the actual value of assets owned by the defendant at the time the prenuptial agreement was entered into.
1. Fleet Bank Savings Account $8,500.00
2. Twelve (12) shares CitiCorp 129.00
3. Cortland Trust/U.S. Bioscience 67,000.00
4. Dandy Distributors, Inc. 100,000.00
5. Note Receivable (Albert J. Salame, Sr.) 75,000.00
6. Salame Trust — 25% interest 31,250.00
 (The only asset in the trust as of the end of December, 1991, was the promissory note from the defendant's father to the trust in the face amount of one hundred twenty-five ($125,000) dollars, as a result of a loan to him in that amount on October 15, 1991. The CT Page 3146 defendant's twenty-five percent interest in that loan amounts to thirty-one thousand two hundred fifty ($31,250) dollars.)
7. Miscellaneous personal property 15,000.00
TOTAL ASSETS $296,879.00
He did not have any liabilities.
The defendant's current financial condition consists of the following assets and liabilities:
A. ASSETS
Savings/checking account $700.00
Dandy Distributors, Inc. (10 shares) 100,000.00
CitiCorp (13 shares) 845.00
AIM Aggressive Growth (1173.36 shares) 41,712.95
AIM Constellation Fund (740 shares) 15,325.40
Salame Family Trust (25% interest) 62,500.00
AIM (164 shares — IRA) 5,830.20
Fleet Savings — IRA 2,411.00
Note Receivable (Albert J. Salame, Sr.) 75,000.00
Miscellaneous personal property 5,000.00
Cash surrender value life insurance 8,957.21
TOTAL VALUE OF ALL ASSETS $318,281.76
B. LIABILITIES
Redding Country Club $10,429.00
Elizabeth Salame (mother) 12,500.00
VISA 800.00
MasterCard 800.00
Macy's 800.00
TOTAL LIABILITIES $25,329.00 CT Page 3147
The court finds that the circumstances of the parties, at the present time, is not so beyond the contemplation of the parties at the time the premarital contract was entered into as to cause its enforcement to work injustice.
The plaintiff is thirty-one (31) years old and in good health. The plaintiff developed varicose veins in the fifth month of her pregnancy. Her legs will cramp if she's on her feet for a long period of time, and she wears special shoes and special support stockings for this problem. The plaintiff had graduated from Colby College in New Hampshire and received her bachelor's degree prior to the time the parties married. The plaintiff is presently enrolled in college and expects to receive her degree in June, 1998. She attends class one evening per week from 4:00 p.m. to 6:00 p.m. and then from 7:00 p.m. to 9:00 p.m. She intends to teach kindergarten to sixth grade in special education upon obtaining her degree. She intends to have surgery sometime in 1996 to correct the problem. She received an associate degree in business administration in 1984 and her bachelor degree in 1986. She had obtained a student loan when she was enrolled in college prior to the marriage. That loan existed at the time the parties married. The defendant paid five thousand sixty-seven dollars and sixty-six cents ($5,067.66) on that loan prior to the date that the parties married, and paid seven thousand two hundred sixty-six dollars and four cents ($7,266.04) on the loan to pay off the loan in full after the parties married. In addition to the seven thousand two hundred sixty-six dollars and four cents ($7,266.04) that was paid off after the parties married, the following two payments were made after the premarital agreement was entered into: (1) check number 932, dated December 29, 1993, in the amount of one hundred twenty dollars and twenty-one cents ($120.21); and (2) check number 933, dated January 2, 1994, in the amount of one hundred one dollars and thirty-six cents ($101.36). Therefore, the balance that was due on the loan as of the date of the premarital agreement was seven thousand two hundred sixty-six dollars and four cents ($7,266.04), plus one hundred twenty dollars and twenty-one cents CT Page 3148 ($120.21), plus one hundred one dollars and thirty-six cents ($101.36) for a total of seven thousand four hundred eighty-seven dollars and sixty-one cents ($7,487.61).
The plaintiff will obtain her master's degree in special education in June, 1998. She will then be able to obtain employment that will pay an annual wage of approximately twenty-five thousand ($25,000) dollars and can increase up to thirty thousand ($30,000) dollars. She will not need alimony after she obtains employment due to her master's degree. That employment will probably commence in September, 1998, when the school year normally commences.
The plaintiff was employed between December, 1985 and May, 1986 as an internship position with a television station in Manhattan. Between June, 1986 and July, 1987, she was employed as a research analyst in Manhattan. In July of 1987, she obtained employment at Mellow Carting until January, 1990. Between January, 1990 and June, 1990, she was employed by Automated Waste Disposal earning a gross weekly income of one thousand ($1000) dollars. That is the highest income she has ever received. The plaintiff quit that job with Automated Waste Disposal. She was then employed by Dandy Distributors, Inc. from September, 1990 to May of 1991, doing sales work and account penetration, and earning a gross weekly income of four hundred ($400) dollars. Following her termination from Dandy Distributors, Inc., she opened her own cheesecake business. She did that until the fall of 1991. She received unemployment compensation from May, 1991 to the fall of 1992. She then returned to Automated Waste Disposal in August of 1992, working there for three months and grossing between six hundred to six hundred fifty ($600 to $650) dollars weekly. That employment at Automated Waste Disposal was for a specific assignment. During the calendar year 1992, she received nine thousand nine hundred ninety ($9990) dollars in unemployment compensation payments. The plaintiff did not have any income in 1993 or 1994. She did have income in 1992.
The defendant is thirty-three (33) years old and he does not have any medical problems. He is in good physical health and in relatively good mental health. He graduated from Bently College in Massachusetts with a four year degree.
The defendant's gross income from Dandy Distributors, Inc. in 1992 was ninety-five thousand nine hundred fifty ($95,950) dollars. His gross income from Dandy Distributors, Inc. in 1993 CT Page 3149 was ninety-seven thousand one hundred ($97,100) dollars, plus trust income of six thousand four hundred seventy-four ($6474) dollars. His 1994 gross earnings were one hundred fifteen thousand nine hundred fifty ($115,950) dollars. His proposed income tax return for 1995 shows gross earnings of sixty-two thousand one hundred ($62,100) dollars.
He was employed by Dandy Distributors, Inc. at the time the parties married. That has been his only employer since the parties married. He was also employed by Dandy Distributors, Inc. when the parties met in 1989.
The parties separated October 26, 1994. At the time of separation, they had a joint bank account at Fleet Bank. The plaintiff withdrew five thousand ($5000) dollars from that account on October 31, 1994. The defendant withdrew twenty-five thousand two hundred forty-six dollars and fifteen cents ($25,246.15) from the account on October 31, 1994, reducing the balance to zero. He used approximately twelve thousand ($12,000) dollars of that amount in fixing up the condo he occupies that is owned by his father, including installing new carpeting, painting, and installing a new kitchen floor. Part of the money was also used to pay his attorney's fees.
The plaintiff's financial affidavit, dated January 11, 1996, shows an eight thousand five hundred ($8500) dollar loan. That's a student loan in which repayment is deferred until she graduates.
She also shows under liabilities, a loan in the amount of ten thousand ($10,000) dollars. That's a loan from a personal friend. Seven thousand five hundred ($7500) dollars of that loan was used towards her attorney's fees, twelve hundred ($1200) dollars towards the hiring of a detective and the balance for miscellaneous expenditures. She shows a debt to Dr. Cohen. He is a psychiatrist that she commenced seeing in August, 1995. Her present health insurance coverage does not provide for any remaining benefits at the present time for that treatment. She also has a liability of seventeen hundred ($1700) dollars to Dr. Singleton, who is also a psychiatrist, that she has seen over the last few years. The parties received medical reimbursement from the health carrier for the bill of Dr. Singleton, consisting of three checks, two of which were each in the amount of three hundred ($300) dollars, and a third in the amount of four hundred ($400) dollars, for a total of one thousand ($1000) dollars. At CT Page 3150 the plaintiff's request, the defendant signed those checks and turned them over to the plaintiff, but the plaintiff did not apply those checks to the bill of Dr. Singleton. She has a debt to her father with a balance of eight thousand four hundred ninety-five dollars and forty-one cents ($8,495.41). Those funds were used in part towards the automobile down payment of two thousand ($2000) dollars and to hire an accountant. She also shows a debt to Weeks Auto of five hundred ($500) dollars. That was used as a personal loan to purchase the vehicle she owns. The estimated balance on her attorney's fees is twelve thousand four hundred twenty-six dollars and eighty-five cents ($12,426.85). The plaintiff's financial affidavit, dated December 28, 1994, shows a ten thousand ($10,000) dollar loan. Pendente lite orders were entered on January 4, 1995. All of her current liabilities, other than the ten thousand ($10,000) dollar loan, were incurred since the date the pendente lite order of January 4, 1995 was entered.
She presently has two IRAs. Her two IRAs consist of Fahnestock with a value, as of January 31, 1995, of three thousand twenty-two dollars and ninety-one cents ($3022.91) and Hudson Capital Fund with a value of one thousand eight hundred ninety-six ($1896) dollars. Her Fahnestock fund and Hudson fund were both acquired from money provided by the defendant during the term of the marriage. She has a savings account at Putnam County Savings and Checking with a balance of two hundred nineteen ($219) dollars.
She also shows a 1993 Ford that was purchased in October, 1995, and is in her name only. The fair market value of that vehicle is eight thousand six hundred thirty-three ($8633) dollars. It has a loan balance of six thousand six hundred thirty-three ($6633) dollars and an equity of two thousand ($2000) dollars. The parties are in dispute as to the fair market value of her diamond engagement ring, pearls, necklace and earrings. Her diamond ring cost fourteen thousand eighty ($14,080) dollars in 1989. From the evidence presented to the court, the court finds the fair market value of those items to be as follows: (a) diamond ring, twenty-one thousand ($21,000) dollars; (b) pearls, one thousand four hundred ninety-five ($1495) dollars; (c) necklace, two hundred fifty ($250) dollars; and (d) diamond earrings, two hundred fifty ($250) dollars. The seventy-two ($72) dollar debt to Katonah Hospital has been paid in full. CT Page 3151
The defendant's financial affidavit, dated January 11, 1996, shows a gross weekly income from the defendant's employment at Dandy Distributors, Inc. of one thousand one hundred fifty ($1150) dollars. That amounts to a gross annual income of fifty-nine thousand eight hundred ($59,800) dollars. The salaries of the nonwarehouse employees of Dandy Distributors, Inc. are set by all of the stockholders with the defendant's father having the final word since he has the majority vote. This procedure applies to all officers, shareholders and upper managers. The defendant is presently the president of Dandy Distributors, Inc., and has held that position for approximately three to five years. Prior to that time, his father had been president and his uncle had also been president. For the past year and one-half, he has not been devoting as much time to the business as he should. The sales of the business are down approximately 9.6 percent during the last quarter of 1995. The business is experiencing severe competition from other businesses in the area. The defendant is not performing at the proper level that he should be performing as a result of the pendency of this dissolution action. Corporate officers normally receive bonuses in March of each year. Bonuses were received in March of 1994 and March of 1995. The court finds that the defendant's gross weekly income from Dandy Distributors, Inc. is eleven hundred fifty ($1150) dollars, and his net weekly income is seven hundred thirty-eight dollars and seventy-nine cents ($738.79). The court further finds that the defendant has the right to receive one-fourth of the interest income generated from the Salame Family Trust. The purpose of that trust is to provide a method by which the defendant's father can maintain life insurance. The court finds that the only source of income for the trust to maintain that life insurance is by the defendant's father paying the interest of 7 percent on the two hundred fifty thousand ($250,000) dollars of promissory notes that he has signed payable to the Salame Trust. The annual interest on that two hundred fifty thousand ($250,000) dollars amounts to seventeen thousand five hundred ($17,500) dollars, and the defendant's 25 percent share amounts to four thousand three hundred seventy-five ($4375) dollars annually. Under the provisions of article eight of the Salame Trust, the trustee only has the discretion to use the interest that the trust receives from the defendant's father for funding life insurance for the defendant's father in the absence of a request by the grantors of the trust (of which the defendant is one of four) to have the interest paid over to the grantor. While a grantor does not have the right to withdraw interest from the trust, nevertheless, the trustee does not have the right to apply the interest to purchase CT Page 3152 life insurance unless the grantor fails to request that the interest be paid to the grantor. The court finds that it is probable that the defendant's father will pay the interest that is due to the trust on the total of two hundred fifty thousand ($250,000) dollar promissory notes that he signed, and that the trustee will pay to the defendant his 25 percent interest in that interest income if requested by the defendant. Further, the defendant's father owes him seventy-five thousand ($75,000) dollars on an unsecured promissory note. The court finds that a reasonable interest rate on such a note is 12 percent per annum and that, therefore, the defendant has the right to receive nine thousand ($9000) dollars annually in interest from his father, which the court is also imputing to the defendant, as well as four thousand three hundred seventy-five ($4375) dollars from the Salame Trust, in determining his net income for the purpose of entering financial orders. During the course of the marriage, the defendant has had the use of a vehicle owned by Dandy Distributors, Inc. He presently has the use of a jeep that is owned by Scope Realty. The defendant's father is the sole owner of Scope Realty. The defendant has had the use of the jeep for approximately two and one-half years. The defendant pays for gasoline for the jeep. Dandy Distributors, Inc. has hired extra managerial help due to the fact that the defendant has not been performing all of his duties. The gross receipts for Dandy Distributors, Inc. decreased in 1995. The defendant's financial affidavit also shows a note receivable from the defendant's father in the face amount of seventy-five thousand ($75,000) dollars, and alleges that the defendant has a liability to his father of thirty-four thousand two hundred ($34,200) dollars for back rent, and two thousand ($2000) dollars that the defendant alleged that he borrowed from his father in 1995, thereby reducing the note from seventy-five thousand ($75,000) dollars to thirty-eight thousand eight hundred ($38,800) dollars. The court finds that that claim is not credible and that the balance of that note is seventy-five thousand ($75,000) dollars. The defendant's father borrowed seventy-five thousand ($75,000) dollars from the defendant on April 6, 1991. His father also borrowed sixty-five thousand ($65,000) dollars from the defendant's brother at the same time. The defendant's father testified on the issue of paying interest on the seventy-five thousand ($75,000) dollars that he would do whatever the defendant feels is correct. The court finds that the amount of interest that should be imputed to the seventy-five thousand ($75,000) dollars approximately equals the alleged amount due for back rent and, therefore, there is no back rent due from the CT Page 3153 defendant to his father and that there was not a two thousand ($2000) dollar loan from the defendant's father to the defendant. Therefore, the balance due on the note remains at seventy-five thousand ($75,000) dollars. The plaintiff and the defendant paid rent to the defendant's father up to September of 1991. After September of 1991, his father agreed that in lieu of interest accumulating on the promissory note that the plaintiff and the defendant would pay no rent for a period of six months, commencing September, 1991. On or about January or February of 1992, the defendant asked his father to repay the seventy-five thousand ($75,000) dollar loan. The loan has not been repaid.
The defendant's financial affidavit, dated January 11, 1996, under assets, shows one thousand one hundred seventy-three point three six (1173.36) shares of AIM Aggressive Growth at thirty-nine dollars and fifty-five cents ($39.55) per share. As of the date of trial, the value per share was thirty-five dollars and fifty-five cents ($35.55). Therefore, the total value of the AIM Aggressive Growth is forty-one thousand seven hundred twelve dollars and ninety-five cents ($41,712.95). His financial affidavit also shows 740 shares in AIM Constellation Fund at twenty-two dollars and fifty-one cents ($22.51) per share. As of the date of trial, those shares had a value of twenty dollars and seventy-one cents ($20.71) for a total value in the fund of fifteen thousand three hundred twenty-five dollars and forty cents ($15,325.40). His affidavit shows under IRA accounts, 164 shares of AIM at thirty-nine dollars and fifty-five cents ($39.55) per share. The correct value per share is thirty-five dollars and fifty-five cents ($35.55), for a total value of five thousand eight hundred thirty dollars and twenty cents ($5,830.20). Those shares were acquired during the period of the marriage to the plaintiff. He also shows a Fleet savings account with a balance of two thousand four hundred eleven ($2411 ) dollars. That is the same Fleet savings account that he had at the time the premarital agreement was entered into that was in his name and the plaintiff's name with a balance of eight thousand five hundred ($8500) dollars. He has two insurance policies with Northwestern Life, one in the face amount of two hundred ninety-three thousand four hundred fifty-six ($293,456) dollars, and a second in the face amount of two hundred fourteen thousand five hundred thirty-four ($214,534) dollars. He prefers to keep in place the larger of the two policies that would result in reducing his monthly insurance premiums approximately in half. The annual premium for both Northwestern Life policies amounts to approximately fourteen hundred eighty-seven ($1487) dollars. In CT Page 3154 the event, one of the two policies is canceled, it will reduce his insurance cost by approximately seven hundred forty ($740) dollars annually. He has an outstanding liability to the Redding Country Club of ten thousand four hundred twenty-nine ($10,429) dollars. In approximately December of 1995, he borrowed twelve thousand five hundred ($12,500) dollars from his mother to be used toward attorney's fees, and that liability is shown on his financial affidavit. As of January 18, 1996, he had paid a total of twenty thousand ($20,000) dollars in legal fees as a result of the dissolution of marriage action. He shows a liability to Dandy Distributors, Inc. for car insurance for one thousand five hundred ($1500) dollars, covering the cost of car insurance during the period of time that the plaintiff had use of that vehicle. The court does not find that to be a valid liability. The premarital agreement showed an asset with "Cortland Trust/U.S. Bioscience" with a value of sixty-seven thousand ($67,000) dollars. His current financial affidavit shows two separate AIM mutual funds. The defendant made an investment change and transferred his Cortland Trust/U.S. Bioscience stock to an AIM mutual fund. The premarital agreement does not exclude the Cortland Trust/U.S. Bioscience from distribution to the plaintiff in whole or in part in the event of dissolution of marriage.
The defendant owns a thirty (30) year old watch with an approximate fair market value of eight hundred to one thousand ($800 to $1000) dollars.
A. DANDY DISTRIBUTORS, INC.
The defendant owns ten shares, which amounts to a 10 percent interest in Dandy Distributors, Inc. His financial affidavit lists that value as one hundred ninety thousand six hundred seventy-two ($190,672) dollars, which represents the book value of the closely held corporation for the fiscal year ending March 31, 1995. A stock purchase agreement was entered into on December 18, 1986 between all of the shareholders of Dandy Distributors, Inc. and Dandy Distributors, Inc. The relevant portions of that agreement in determining the value of the defendant's interest in Dandy Distributors, Inc., as of the present time, are paragraphs 2a, 2b, 3b and 6a. Those paragraphs provide, in part, as follows:
 2. Lifetime Restrictions. Each Shareholder agrees that he will not transfer, hypothecate, assign, or otherwise alienate any of his shares, or any right, CT Page 3155 title or interest therein, without the prior written consent of the Company and of the other Shareholders, unless he shall have first made the offer to sell hereinafter set forth:
 (a) The transferring Shareholder shall deliver a written offer to the Company and to the other Shareholders specifying the number of shares, the name and address of the prospective transferee, the proposed price and other terms of the transfer.
 (b) For a period of twenty-one (21) days following receipt of the written offer, the Company shall have the option to purchase the stock, subject to the restrictions governing the right of a corporation to purchase its stock under applicable local law. The terms and conditions of the purchase referred to herein shall be determined as set forth herein and shall be the lesser of the price set forth in the offer, or the price determined in paragraph (6) below. In the event the option shall be exercised by the Company, the Secretary of the Company shall give written notice of such exercise to the transferring Shareholder, and the Company shall pay the purchase price in the manner herein provided. The payment for same shall be determined by the price paid. If the price is dictated by paragraph (6) then the sum shall be repaid as called for therein. If it is determined by the offer, then it will be repaid under the same terms as set forth in the offer.
3. Events Giving Rise to Purchase Options.
 (b) Bankruptcy or Divorce. In the event any Shareholder is adjudged a Bankrupt, files for such designation and/or the protection of the Federal Bankruptcy rules, or is a party to any divorce proceeding wherein a court of competent jurisdiction could make orders regarding the transfer and/or disposition of the Shareholder's interest in the Company, then such event shall give rise to the option to purchase such Shareholder's interest. Said option shall be first exercisable in the Company and then in the remaining Shareholders, just as if the Shareholder had made an offer to sell pursuant to Article 2 hereof. CT Page 3156 The option contained herein shall exist for a period of ninety (90) days from the date that the Company or any Shareholder gains knowledge of the event giving rise to the option hereunder and shall continue as long as the bankruptcy or divorce proceeding continues. The price and method of payment shall be the same as set forth in Article 6 hereof (Death of a Shareholder).
6. Purchase of Shares Upon Death.
 (a) Purchase Price. The price of each share of stock under this agreement shall be determined as follows:
 The price of each share of stock of the Company to be purchased and sold under this agreement shall be fixed by the Shareholders, as evidenced by a certificate setting forth such fixed price, which certificate shall be dated and executed by the Shareholders and attached hereto. The fixed price set forth in the certificate attached hereto as Schedule A shall be binding on the Shareholders for all purposes of this Agreement and shall be controlling until the close of the Company's 1988 fiscal year. A new certificate shall be affixed within forty-five (45) days from that date and on each third (3rd) anniversary date thereafter. During the forty-five (45) day period following the last day of the Company's fiscal year ending within the calendar years 1988, 1991 and each subsequent third year thereafter, any Shareholder may request that a study be undertaken to arrive at a new fixed price to be agreed upon by the Shareholders. No such request shall alter the then effective fixed price prior to the execution of a new fixed price certificate. The new fixed price shall take effect as of the date of execution of the certificate, and shall be binding on the Shareholders for all purposes, subject to the limitations of this paragraph. If, during the appropriate forty-five (45) day period, no Shareholder makes a request for a study to be undertaken to arrive at a new fixed price to be agreed upon by the parties, the fixed price set forth in the latest executed certificate, attached hereto, shall remain in effect for the subsequent three year period.
The one million ($1,000,000) dollar value set in Schedule A of the stock purchase agreement has never been amended. Therefore, this court finds that the defendant's 10 percent interest in Dandy Distributors, Inc., both at the time the CT Page 3157 premarital agreement was entered into, as well as the present time, is one hundred thousand ($100,000) dollars.
The three hundred thousand ($300,000) dollar value that the defendant placed on his 10 percent interest in Dandy Distributors, Inc., under the premarital agreement, was based on what he believed the business was worth. The book value of his interest was approximately one hundred forty thousand ($140,000) dollars in December of 1991 in Dandy Distributors, Inc. The miscellaneous personal property that he valued at fifteen thousand ($15,000) dollars in the premarital agreement, consisted of a large TV, stereo, his clothing and furniture. He did not have any liabilities when the premarital agreement was entered into.
B. SALAME FAMILY TRUST
The Salame Family Trust was created as part of the defendant's father's tax plan and estate plan. The trust alleges on page one that certain assets have come from the estates of the defendant's grandparents. In fact, none of the assets of the trust came from the defendant's grandparents. The trust instrument itself shows on Schedule A that on October 15, 1991, the sum of ten ($10) dollars was transferred into the trust. The accounting for the trust funds shown as plaintiff's exhibit seventeen (17) does not reflect that ten ($10) dollars. It shows that there were principal additions to the trust consisting of one hundred twenty-five thousand ($125,000) dollars on October 15, 1991; fifty thousand ($50,000) dollars on February 14, 1992; and seventy-five thousand ($75,000) dollars on November 10, 1994. The trust assets at the present time consist of promissory notes signed by the defendant's father totalling two hundred fifty thousand ($250,000) dollars. On October 15, 1991, when the one hundred twenty-five thousand ($125,000) dollars was paid into the trust by the defendant's father, he borrowed the same one hundred twenty-five thousand ($125,000) dollars from the trust at a 7 percent interest rate. He did not pay any interest on that loan in 1991 or 1992. On February 14, 1992, when the defendant's father had advanced fifty thousand ($50,000) dollars to the trust, he borrowed fifty thousand ($50,000) dollars from the trust on the same date at a seven percent interest rate. No interest was paid on that loan in 1992. At the end of the calendar year 1993, interest was paid in the amount of twenty-five thousand eight hundred ninety-five dollars and twelve cents ($25,895.12) to the trust on the one hundred twenty-five thousand CT Page 3158 ($125,000) dollar loan and the fifty thousand ($50,000) dollar loan. On November 10, 1994, the defendant's father advanced seventy-five thousand ($75,000) dollars to the trust and borrowed seventy-five thousand ($75,000) dollars from the trust on the same date at the rate of 7 percent interest. No interest was paid on any of the loans by him in the calendar year 1994. In the calendar year 1995, the defendant's father paid a total interest to the trust of thirty thousand three hundred ninety-seven dollars and twenty-four cents ($30,397.24). The trust is a "Grantor" trust and under IRS rules, all income is taxed to the Grantors regardless of distribution. On April 2, 1994, four thousand ($4000) dollar distributions were paid out each to the defendant, to Kamil Salame, to Mary Elizabeth Salame, and to Jacqueline Salame. These distributions were made to help offset the tax each Grantor had to pay in April of 1994, based on 1993 income. Each Grantor will receive a K1 for his or her proportionate share of the thirty thousand three hundred ninety-seven dollars and twenty-four cents ($30,397.24) interest paid in 1995 by the defendant's father. The trust agreement provides in article 2 that "if sufficient funds are available, the trustee may use any premium on such insurance policy held hereunder." The trust accounting shows that on April 11, 1995, insurance premiums were paid to the Hartford Insurance Company in the amount of thirty-one thousand one hundred sixty ($31,160) dollars and on July 10. 1995. insurance premiums were paid to the Hartford Insurance Company in the amount of seven thousand nine hundred forty-five dollars and eighty cents ($7,945.80); and that the trust now has a deficit of seventeen thousand nine hundred eighty-three dollars and forty-four cents ($17,983.44) that constitutes a debt owed to the defendant's father. The trust instrument itself only allows insurance premiums to be paid for insurance on the defendant's father's life if sufficient funds from income or principal are available. Article VIII.A of the trust instrument provides as follows:
 VIII. DISPOSITION OF INCOME AND PRINCIPAL DURING GRANTOR'S AN D SUBSTITUTED GRANTOR'S LIFE:
 A) The Trustee may pay or apply all or any portion of the net income of the Grantor(s) or substituted Grantor's respective Trust account(s) to or for the benefit of the Grantor or substituted Grantor for whom the account was established, at least annually or more frequent payments as prescribed by the Trustee, together with such amounts of CT Page 3159 principal, when allowed and pursuant to Article IV above, as the Grantor may request in writing from time to time. In the absence of such right and/or a request or direction, the Trustee may pay or expend the Grantor(s) and substituted Grantor(s) (hereinafter Grantor) respective principal and/or income as follows; (i) to or for the benefit of the respective Grantor; (ii) to or for any use the respective Grantor(s) should agree upon, in writing, from his or her respective Trust account; (iii) such amounts of income and principal as the Trustee in the Trustee's sole discretion shall deem proper from time to time for the respective Grantor for his or her health, comfort, support and maintenance; (iv) to or for the payment of life insurance premiums insuring the life of any person who the respective Grantor has an insurable interest in; (v) to loan, by promissory note, any amounts of principal and/or income to the Grantors' father ALBERT SALAME or any of his various business entities; and (vi) for any agreed upon use as agreed to in accordance with the written agreement of the Grantor(s) as set forth in Paragraph B below. The Trustee need not expend and/or pay out all income or any part thereof nor need the Trustee expend and/or pay out any principal. The Trustee shall add any unexpended income to the respective Grantor's Trust account. The exercise of this discretion as to the expenditure or withholding of income and/or principal shall be conclusive as to advisability and shall not be questioned by anyone. Upon the death of any Grantor, the provision of Article IX shall apply and the beneficiaries determined under that Article shall be substituted Grantors hereunder and shall be entitled to participate and receive distributions as allowed under this Trust based upon their respective percentage interest in their subTrust account. Nothing contained herein, however, will grant them any rights to withdraw their interest as so limited herein. The purpose and intent of this provision is to grant the Trustee total and complete discretion in the use of the principal and/or income of the Grantor's respective Trust account within the above defined uses.
The plaintiff did not have any taxable income in 1994. The parties would have had a refund of approximately six thousand six hundred ($6,600) dollars if the plaintiff had agreed to sign a joint income tax return for the calendar year 1994, which the CT Page 3160 defendant had proposed splitting equally with the plaintiff. His separate tax return for the calendar year 1994 will result in a refund of approximately three hundred forty-nine ($349) dollars. The plaintiff refused to sign the joint 1994 tax return.
This court has considered the provisions of § 46b-82
regarding the issues of alimony, and has considered the provisions of § 46b-81 (c) regarding the issues of property division, and has considered the provisions of §§ 46b-56 and46b-56a regarding the issue of custody and visitation, and has considered the provisions of § 46b-84 and the child support guidelines regarding the issue of support, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders:
A. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF CUSTODY AND VISITATION
1. The parties entered into an agreement regarding custody and visitation during the course of the trial. That agreement is approved of and orders are entered in accordance with that agreement.
C. BY WAY OF SUPPORT
1. The parties are in dispute as to how to calculate the amount of support to be paid by the defendant to the plaintiff. In determining support, the court has included the defendant's gross annual income of fifty-nine thousand eight hundred ($59,800) dollars, plus the gross annual income imputed to him from interest on the seventy-five thousand ($75,000) dollar promissory note owed to him by his father in the annual amount of nine thousand ($9000) dollars, plus interest income from the Salame Trust in the annual amount of four thousand three hundred seventy-five ($4375) dollars, totalling seventy-three thousand one hundred seventy-five ($73,175) dollars. In calculating the social security (FICA), federal withholding tax and state withholding tax, the court has deducted from the defendant's gross income the standardized deduction of a married person filing separately for the calendar year 1995 of three thousand two hundred seventy-five ($3275) dollars, plus twenty-five CT Page 3161 hundred ($2500) dollars as an exemption. From that amount of sixty-seven thousand four hundred ($67,400) dollars, the court has deducted social security in the amount of four thousand seven hundred seventy-one ($4771) dollars, federal withholding tax in the amount of sixteen thousand nine hundred thirty-eight ($16,938) dollars, and state withholding tax in the amount of one thousand nine hundred thirty-six ($1936) dollars, leaving a net annual income of forty-three thousand seven hundred fifty-five ($43,755) dollars, and a net weekly income of eight hundred forty-one dollars and forty-four cents ($841.44). The court finds that the amount of support under the guidelines would be two hundred one ($201) dollars per week. The court is entering an order in substantial compliance with the guidelines and orders that the defendant pay to the plaintiff as support, the sum of two hundred ($200) dollars per week. An immediate wage execution is authorized. The defendant is also ordered to provide health insurance, including dental insurance for the benefit of the minor child. The parties have to divide equally any uncovered or unreimbursed health expenses for the minor child.
2. The defendant is ordered to name the plaintiff as irrevocable beneficiary on his Northwest Mutual Life insurance policy in the face amount of two hundred ninety-three thousand four hundred fifty-six ($293,456) dollars. That policy is to remain unencumbered and commencing January 2, 1997, and annually thereafter, he is to provide written evidence to the plaintiff that such policy, unencumbered, is in full force and effect, and that she is named as beneficiary. She is to continue to be named as beneficiary for so long as there is an outstanding support and/or alimony order. The term of naming her as beneficiary is nonmodifiable. The amount of the insurance may be reduced by ten thousand ($10,000) dollars annually commencing January 2, 1997, and annually thereafter.
D. BY WAY OF ALIMONY
1. The defendant is ordered to pay to the plaintiff, as alimony, the sum of one hundred seventy-five ($175) dollars per week. Alimony is to terminate on the earliest of the following events: (1) the death of the plaintiff; (2) the death of the defendant; (3) the remarriage of the plaintiff; (4) September 1, 1998.
2. Alimony is nonmodifiable as to term. The provisions of §§ 46b-86 (a) and 46b-86 (b) are applicable. CT Page 3162
3. The defendant is also ordered to maintain health insurance for the benefit of the plaintiff under COBRA for the maximum period of time allowed by law. The two hundred seventy-one ($271) dollar monthly cost of maintaining that coverage is to be paid by the defendant for so long as he has an obligation to pay alimony. When the obligation to pay alimony terminates, then the cost for such coverage is to be paid by the plaintiff.
E. BY WAY OF PROPERTY ORDERS
1. The plaintiff is to pay all the liabilities shown on her financial affidavit, dated January 11, 1996, and hold the defendant harmless therefrom.
2. The defendant is to pay all the liabilities shown on his financial affidavit, dated January 11, 1996, and hold the plaintiff harmless therefrom.
3. The motor vehicle shown on the plaintiff's financial affidavit is awarded to the plaintiff. She is to hold the defendant harmless from the loan balance thereon.
4. All of the jewelry shown on the plaintiff's financial affidavit is awarded to the plaintiff.
5. The parties entered into an agreement regarding the division of personal property except for the 50 inch Mitsubishi TV set. That agreement is approved of and orders are entered in accordance with that agreement. The disputed TV set is awarded to the plaintiff.
6. The Putnam County Savings and Checking account shown on the plaintiff's financial affidavit is awarded to the plaintiff.
7. The IRA Fahnestock and IRA Hudson Capital Fund shown on the plaintiff's financial affidavit are awarded to the plaintiff.
8. The AIM IRA account (164 shares) shown on the defendant's financial affidavit is awarded to the plaintiff.
9. The Fleet Savings and Hudson Capital assets, as shown on the defendant's financial affidavit as IRAs, are awarded to the defendant. CT Page 3163
10. All of the defendant's interest in Dandy Distributors, Inc. is awarded to the defendant.
11. All of the defendant's interest in the Salame Family Trust is awarded to the defendant.
12. The plaintiff is awarded 30 percent of the AIM mutual funds, consisting of AIM Aggressive Growth and AIM Constellation Fund, shown on the defendant's financial affidavit.
13. The seventy-five thousand ($75,000) dollar note receivable shown on the defendant's financial affidavit is awarded to the defendant.
14. The defendant is to transfer to the plaintiff four thousand five hundred ($4500) dollars representing approximately one-half of the cash surrender value in the defendant's two life insurance policies.
F. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either the plaintiff or the defendant.
G. MISCELLANEOUS ORDERS
1. The parties are ordered to exchange copies of their federal and state income tax returns within thirty (30) days after such returns have been filed by certified mail, return receipt or registered mail, return receipt, for so long as there is an outstanding support and/or alimony order.
2. The defendant shall have the right to claim the minor child as an exemption for federal and state income tax purposes for each calendar year in which he is current in his alimony and support payments at the end of such calendar year.
3. Counsel for the plaintiff is to prepare the judgment file within thirty (30) days and send it to counsel for the defendant for signature and filing.
Axelrod, J. CT Page 3164